Opinion delivered May 15, 1889.

---

No. 6347.

FRANK WOODS *v.* THE STATE.

1. PRACTICE—VENUE.—The record in this case failing to show that the venue of the offense was proved as alleged, the conviction must be set aside.

2. SAME—CIRCUMSTANTIAL EVIDENCE—CHARGE OF THE COURT.—See the opinion for a charge of the court upon the law of circumstantial evidence *held* erroneous, and in view of the defendant's exception, cause for reversal. In lieu of the said erroneous charge, the accused asked a special charge on the subject, in the usual form, which the trial court refused. *Held*, error.

3. SAME—WANTON AND MALICIOUS KILLING OF A HORSE.—See the statement of the case for a special charge of the court requested by the defense which, in view of the proof, was erroneously refused.

APPEAL from the County Court of Clay. Tried below before the Hon. B. F. Turner, County Judge.

This conviction was for wantonly killing a horse, and the penalty assessed was a fine of forty dollars.

J. B. Young testified, for the State, in substance, that he owned the horse mentioned in the information. He bought that animal from John Burson in August, 1887, at which time the horse was nearly two years old. Witness thought the animal was a gelding, but did not throw him down to verify that opinion. After keeping the animal in a pasture for about two months, the witness turned him on the range on Buffalo creek, near Red Lake. Witness missed him from the range about a week before he was killed. About an hour before sun down, on Thursday evening, April 26, 1888, witness went to defendant's house, hunting his said animal. Defendant said that, on that day, he saw the animal at a certain point about three-quarters of a mile east of his house, and that if witness would go to that place he would find him. Witness replied that if the animal was at the point indicated by defendant it was all right. He then rode off in a north direction, and at a point about a quarter of a mile distant from defendant's house he found his said horse lying under a cottonwood tree. He had been recently castrated, had bled profusely, and was not quite dead. Witness followed a trail of blood from the point where the horse was lying to a point within fifty yards of where he had seen defendant standing a few minutes before, and within twenty or thirty steps of the lot near which the defendant then had a horse staked on the prairie. Witness then told defendant about the condition in which he found his horse, when the defendant proposed to help witness get the animal in his shed and doctor him. On the next day witness went back to defendant's house and told defendant that he wanted pay for his horse. Defendant denied that he had anything to do with the cutting of the animal, or that he knew anything about it, and refused to pay witness, or to admit any claim against him. The horse was not dead when witness demanded pay of the defendant, but died during the night.

Mr. Ferguson testified, for the State, that Young's horse died from the effects of imperfect castration on Friday night. Witness saw that animal with his mares on the preceding Sunday and on Tuesday morning. Witness next saw Young's horse, dead, about a quarter of a mile from defendant's house. Afterward defendant told witness that Colonel Young had passed him, refusing to speak to him, and that if he and Colonel

Young could get together they could settle the horse matter. The witness thereupon went to see Colonel Young, and he and Young went to defendant's house to see defendant. Young stopped about fifty yards from the house, and witness went to the house, but found that defendant was not at home. He told defendant's wife that Colonel Young was outside, and had come to see what defendant would do about the horse matter. Mrs. Woods replied that defendant had left word for Colonel Young to leave his proposition in writing. Witness reported to Colonel Young, who, with an oath, said he had no proposition to write, but wanted pay for his horse. Witness had never observed that Colonel Young's said horse was a stallion.

Mr. Elkins testified, for the State, that defendant came to his house on the morning of Thursday, April 26, 1888, inquiring for the owner of a stray stallion, which, he said, was bothering his mares. He said that he was breeding his said mares to a stallion of his own, and wanted to get rid of the said stray horse, whose colts he did not want. Witness told him that Colonel Young owned a horse corresponding with the description given by him, and that Mr. Shipman owned one a little darker in color. Defendant left, saying that he was going to ride until he found the owner of that horse.

Mr. Carpenter testified, for the State, that the defendant came to his house on the morning of Monday, April 26, 1888, hunting the owner of a stray stallion which, he said, was bothering his mares. He said also that he was breeding his said mares to his own stallion, and wanted the stray animal taken up. Witness told him that he, too, had mares that were being interfered with by a stray stallion, and that he would like to be rid of him. Defendant replied: "Don't the moon shine? The moon, for some purposes, gives a better light than the sun."

James Burson testified, for the State, that he sold the horse mentioned in the indictment to Colonel Young in August, 1887, at which time the said animal was two years old, less one month. The witness then thought the animal was a gelding. He was the foal of a mare that belonged to witness's sister. He strayed off when about a year old. He was not castrated when he went off, but when recovered, shortly before witness sold him to Young, he had scars about his testicles which led witness to believe he had been castrated. Witness did not critically examine him and could not say positively that he was castrated when bought by Colonel Young.

The State closed.

Mrs. Woods, the defendant's wife, testified, in behalf of the defendant, that defendant owned a stallion to which he was breeding his mares. One morning in April, 1888, the defendant said that a stray stallion was bothering his mares, and that he was going to hunt for the owner to have him taken up. After the defendant came back and went to plowing Colonel Young rode up to the fence, talked with defendant and rode off. He soon came back and went to where the defendant was staking his horse, talked to defendant a few minutes and then left. Next morning Colonel Young came back to the house and demanded that defendant should pay him for the horse, which the defendant refused to do, declaring that he had no hand or part in injuring the horse. No such horse was castrated on the defendant's lot—of that fact the witness, who helped defendant with his stock, was certain. On the day before defendant went to look for the owner of the stray stallion, and on which Colonel Young first came to defendant's house about the horse, the witness saw two men driving three horses past her house towards the cottonwood tree in the hollow, under which Colonel Young was said to have subsequently found his injured horse. Witness did not know either of those men, nor did she, to her knowledge, ever see Colonel Young's said horse.

The special charge of the court referred to in the last head note reads as follows: "If you (the jury) believe from the evidence that the defendant did injure the horse, and if you further believe that it reasonably appeared to defendant that his stock was in danger of serious injury from said horse, and that he inflicted the wound upon the horse to prevent such injury, you will find him not guilty."

*J. A. Templeton*, for the appellant.

*W. L. Davidson*, Assistant Attorney General, for the State.

WILLSON, JUDGE. In this case the Assistant Attorney General confesses error, there being no proof of venue in the record.

In view of another trial, it is proper that we should say that the court's charge upon circumstantial evidence went too far in instructing the jury that "if the facts and circumstances in

evidence could not be accounted for upon any reasonable grounds consistently with the innocence of defendant, and were such as to establish the guilt of the defendant with a degree of certainty to satisfy the mind of a man of ordinary understanding, and so to convince him that he would act upon that conviction," etc., they would convict the defendant. Defendant excepted to this instruction and requested a correct charge upon circumstantial evidence, which was refused, and he excepted; and his exception is, we think, well taken.

Charge number two requested by defendant and refused by the court was a part of the law of the case not embraced in the court's charge, and it was error to refuse it.

Because of the errors named, the judgment is reversed and the cause is remanded.

*Reversed and remanded.*